UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PFS INVESTMENTS, INC., PRIMERICA
FINANCIAL SERVICES, INC., RONALD
P. BARNES, RANDALL L. RADER, and
MARCUS SONNIER,

        Petitioners,

v.

KEVIN IMHOFF,

        Respondent.
                                        /

Case No. 11-10142

Honorable Patrick J. Duggan

## **OPINION AND ORDER**

At a session of said Court, held in the U.S.
District Courthouse, Eastern District
of Michigan, on March 25, 2011.

PRESENT:    THE HONORABLE PATRICK J. DUGGAN
                        U.S. DISTRICT COURT JUDGE

On January 11, 2011, PFS Investments, Inc., Primerica Financial Services, Inc. ("PFSI"), Ronald Barnes, Randall Rader, and Marcus Sonnier ("Petitioners") filed a petition in this Court to compel Kevin Imhoff to arbitrate claims that he has asserted in a pending state-court lawsuit. Before the Court is Petitioners' Motion for Summary Judgment and Request for Expedited Consideration. The matter has been fully briefed, and on March 15, 2011, the Court notified the parties that it was dispensing with oral argument pursuant to Eastern District of Michigan Local Rule 7.1(f)(2). For the reasons stated below, the Court grants Petitioners' Motion.

# I. Factual Background

Primerica Financial Services, Inc. is a marketing company engaged in the sale of financial products and services. PFSI is a broker-dealer registered with the U.S. Securities and Exchange Commission under the Investment Company Act of 1940, and a member of the Financial Industry Regulatory Authority ("FINRA"), a self-regulatory organization governing securities firms. Primerica Financial Services, Inc. and PFSI are subsidiaries of Primerica, Inc. ("Primerica").

Kevin Imhoff began selling Primerica's products in May 1985, and was a registered representative of PFSI for over 20 years. As a registered representative, Imhoff earned commissions by selling securities to clients. Imhoff built a substantial book of business, which he claims included between 13,000 and 18,000 clients, approximately 5,000 to 8,000 insurance and mortgage accounts, and approximately 11,000 investment accounts.

On July 12, 2006, a customer named Patricia Knight came to Imhoff's office to obtain funds from her Individual Retirement Account ("IRA"). The agent of record on the account was Kathy Kirby-Dobbels, who had left Primerica in 2005. Imhoff's office manager assisted Knight in obtaining the IRA funds, and Imhoff claims that Knight was notified of the tax consequences of her withdrawal. The following day, Knight submitted a request to make Imhoff her registered representative. A few days later, Knight returned to Imhoff's office to reverse the transaction, and Imhoff's office manager assisted her in doing so.

On May 9, 2008, Knight sent a complaint letter to Primerica, alleging that Imhoff had given her erroneous advice that caused her to violate the terms of her IRA distribution

and incur tax consequences. Imhoff received a copy of the complaint letter, but did not execute a Form U-4 amendment to report the complaint to FINRA, as the alleged damages of $4,567.37 were below the $5,000 reporting threshold. A Primerica attorney confirmed for Imhoff that he need not file the Form U-4 amendment. During the next several weeks, Imhoff worked to resolve the complaint to Knight's satisfaction, but was unsuccessful.

Around the same time, Imhoff informed his supervisor, Randall Rader, that he was planning to leave Primerica, and the two engaged in buyout discussions. Imhoff wished to transfer his business to either his sister, Susan Olson, or his office manager, Michael Martindale, both of whom were licensed Primerica representatives, but claims that Rader would not allow this. The parties apparently discussed a deal where in exchange for transferring his business to another Primerica agent, Imhoff would receive the release of $31,000 being held in escrow by Primerica Life plus 50% of the commissions generated from his book of business over the next ten years.

Imhoff initially believed that he would become a representative of LPL Financial, but he later elected to affiliate with a Primerica rival, HBW, Inc. ("HBW"). Imhoff claims that Rader became angry with him upon learning of this decision, explaining that all deals with Primerica were off, and that he should "go anywhere else but HBW." Imhoff resigned from Primerica on August 11, 2008. Answer ¶ 14.

On October 6, 2008, Primerica's counsel contacted AIG Life Brokerage ("AIG"), HBW's largest insurance provider, in an e-mail message regarding Imhoff, stating:

> A situation has developed with a Primerica agent who has joined HBW that I really need to talk with you about urgently.

> The agent's name is Kevin Imhoff, and he lives in Lansing, Michigan. He was a big producer at Primerica and we understand that he may be direct to Barney Hellenbrand at HBW.
>
> We have received reports from two Primerica clients who have been misled by Imhoff's office that their accounts "moved with him" and that they merely needed to come into his office to "sign some paperwork" so that he could have access to make changes in their accounts. These misleading statements have been made when the clients have called Imhoff's office, believing they were calling a Primerica office because Imhoff is using the same telephone number that he used for years with Primerica and which is identified with clients as a Primerica number. The number is still listed as a Primerica number today in the telephone directory.
>
> In addition, the Michigan Attorney General's Office is investigating a customer complaint involving Imhoff. In the course of that investigation, Primerica has been communicating with the Attorney General's Office, and the Assistant Attorney General expressed concern that Imhoff was still using the same telephone number. The Attorney General's Office is expecting to hear back from us on this issue.
>
> Given the misrepresentations that have been reported, which also constitute violations of Imhoff's covenants, and the concern expressed by the Michigan Attorney General's Office, we need your urgent assistance to have Imhoff immediately cease using the telephone number (which has been associated with Primerica for so many years) and to transfer it to the Primerica servicing representative in Michigan.

Resp't's Br. Ex. 3 at 2-3. Imhoff claims that this correspondence damaged his reputation with AIG, creating doubt as to whether AIG should allow him to sell its products.

During October 2008, Imhoff and Lori Rivet, a Primerica attorney, discussed sending a letter to Imhoff's clients to inform them of his resignation from Primerica. Imhoff claims that the tone of the letter they discussed was generally positive. They also discussed the continued use of Imhoff's telephone number, and Imhoff claims that Rivet threatened legal action if he did not comply with Primerica's demands to cease using the number.

At about the same time, Primerica assigned 50% of Imhoff's book of business to another agent, Nancy McClintic. Imhoff claims that he received no compensation for this transfer. He asserts that McClintic's staff contacted his clients, telling them that he had retired or was writing a book. On November 3, 2008, Primerica sent letters to Imhoff's clients, stating:

> You are a valued PFS Investments client. We are writing to let you know that your PFS Investments representative, Kevin Imhoff, is no longer affiliated with our firm and has no authority to act on behalf of PFS Investments or any other PFS Company. Your new PFSI representative is Nancy McClintic. Ms. McClintic is an experienced securities professional who has been affiliated with PFS Investments for over 20 years. Ms. McClintic is ready to assist you in reviewing your accounts and addressing your financial questions. She can be reached at (989) 681-6306.

Resp't's Br. Ex. 5. The letters were signed by Marcus Sonnier, Vice President, Office of the General Counsel, Securities Investigations. *Id.* Imhoff claims that the tone of these letters damaged his reputation and image with his clients. Imhoff further asserts that on November 6, 2008, Primerica used a "bulk transfer" to establish McClintic and another Primerica agent, Ronnie Barnes, as the agents of record on his clients' accounts.

On December 15, 2008, Rivet contacted Imhoff to inform him that Primerica was going to file an amendment of his Form U-5 with FINRA. The amendment related to an allegation of an undisclosed outside business activity. The business at issue was Splendid Properties, LLC, owned and operated by Imhoff's wife, Ruth Imhoff. Some of Imhoff's customers had complained that Imhoff had advised them to purchase condominiums from Splendid Properties and misrepresented the mark-up on these purchases. The customers alleged that Imhoff's affiliation with Primerica led them to believe that Primerica had

5

investigated and approved these investments. Imhoff claims that an April 2007 Primerica audit documented his disclosure of his wife's business, and that Primerica had issued him a "clearance letter." He contends that Primerica fabricated the allegations against him in order to harm his reputation.

On December 16, 2008, Primerica settled the Knight complaint for $10,000. Imhoff claims that his input was not solicited, and that the individual responsible for settling the dispute "had not even read his file." Primerica reported the complaint and settlement to FINRA because the settlement amount surpassed the $5,000 reporting threshold. Imhoff argues that Primerica settled the claim for an amount greater than the alleged damages in order to trigger an unwarranted FINRA investigation of him. FINRA later closed this investigation without taking action against Imhoff.

## II. Procedural Background

During early 2009, Imhoff and Primerica resumed negotiations concerning the payment of commissions on Imhoff's book of business. Imhoff, Primerica, and the parties' respective counsel met on April 3, 2009, but failed to resolve the matter. On December 20, 2010, Imhoff filed a Verified Complaint in the Circuit Court of Eaton County, Michigan, naming as defendants McClintic, Barnes, Rader, Sonnier, and Primerica Financial Services, Inc. The Complaint contained a total of 32 counts, including claims of common law conversion, statutory conversion, tortious interference with business relations, tortious interference with contractual relations, usurpation of a business opportunity, unjust enrichment, civil conspiracy, negligent supervision, and vicarious liability. Imhoff did not serve the defendants with the complaint, but he informed PFSI's

6

counsel of the lawsuit when it was filed. Two days later, on December 22, 2010, PFSI's counsel replied that Imhoff was required to arbitrate his claims pursuant to FINRA rules.

On January 5, 2011, Imhoff filed a First Amended Verified Complaint in state court. In that Complaint, he admitted that FINRA rules typically require arbitration of disputes, but maintained that the defendants committed acts inconsistent with the right to arbitrate and so prejudiced his rights that they lost their right to arbitrate. Pet. Ex. B ¶ 101. The First Amended Complaint added several equitable claims, noting that FINRA rules allow courts to hear claims for injunctive relief. In his new claims, Imhoff sought a declaratory judgment, an accounting of commissions, and an injunction prohibiting the defendants from making changes to or disclosing the personal information of Imhoff's clients stored in Primerica computer systems.

On January 11, 2011, Petitioners filed their petition with this Court for an order compelling Imhoff to arbitrate his claims. Petitioners moved for summary judgment the same day, arguing that Imhoff amended his Complaint simply to avoid arbitration. Petitioners asserted that Imhoff's reliance on the injunctive relief exception is misplaced, as that provision applies only to temporary injunctive orders rather than the sort of permanent relief sought by Imhoff. Petitioners also noted that Imhoff had not submitted a Statement of Claim to FINRA as part of his request for injunctive relief, as required by Rule 13804(a)(2). Because Imhoff had failed to adhere to the Rule's requirements, Petitioners argued that this Court must compel arbitration.

Imhoff responded by filing a Second Amended Verified Complaint in state court on January 31, 2011. His new Complaint spanned 113 pages, containing 64 counts and 382

numbered paragraphs.  In this Complaint, Imhoff also named as defendants Primerica Life Insurance Company and Primerica Financial Services Home Mortgages, Inc.  Each count of the Second Amended Verified Complaint states that it relates only to insurance clients as a component of the book of business.

On February 1, 2011, Imhoff filed a Statement of Claim with FINRA, naming McClintic, Barnes, Rader, Sonnier, and PFSI as respondents.  The Statement of Claim asserts 34 counts of common law conversion, statutory conversion, tortious interference with business relations, tortious interference with contractual relations, usurpation of a business opportunity, unjust enrichment, civil conspiracy, and negligent supervision.  The Statement of Claim seeks injunctive and declaratory relief, as well as an accounting of the commissions generated by Imhoff's book of business.  Each count asserts that it pertains only to securities clients as a component of the book of business.

Imhoff filed a response to Petitioners' Motion for Summary Judgment in this Court the same day, contending that Petitioners' Motion must now be denied as moot.  Imhoff argues that he is now in compliance with FINRA Rule 13804(a)(2), as he has filed a Statement of Claim containing the claims that he concludes are arbitrable.  Second, he asserts that FINRA Rule 13200(b) exempts the insurance-related claims from arbitration, and therefore, these claims are properly raised through litigation.  Third, Imhoff argues that FINRA Rule 13804 exempts his equitable claims from arbitration, as the Rule is not limited to temporary claims of injunctive relief.

Petitioners filed a reply on February 8, 2011, arguing that FINRA Rule 13200(b) is applied narrowly, and does not exempt Imhoff's insurance-related claims from arbitration.

They alternatively assert that Imhoff is required to arbitrate his claims pursuant to a "Basic Agreement" he signed upon affiliating with Primerica.

On February 15, 2011, Imhoff filed a supplemental brief with this Court, arguing that several of the state-court defendants are not FINRA members, including Primerica Financial Services, Inc., Primerica Life Insurance Company, and Primerica Financial Services Home Mortgages, Inc. Imhoff concludes that FINRA rules cannot compel him to arbitrate disputes with these defendants. He also claims that the Basic Agreement cannot be used to compel arbitration, as he terminated that Agreement on August 8, 2009.

Petitioners filed a surreply to address these arguments on February 22, 2011. They maintain that Imhoff is equitably estopped from refusing to arbitrate his disputes with the Primerica entities that are not FINRA members. Petitioners argue that the arbitration provision of the "Basic Agreement" survived the Agreement's termination, providing an alternative basis for this Court to compel arbitration.

Imhoff has filed a Motion for Preliminary Injunction in state court, seeking an accounting of commissions and an order prohibiting the alteration or disclosure of personal information relating to certain client accounts. On February 23, 2011, the state court stayed all state-court proceedings for a period of six months pending this Court's ruling on the arbitrability of Imhoff's claims.

### III. Standard of Review

"Before compelling an unwilling party to arbitrate, [a] court must engage in a limited review to determine whether the dispute is arbitrable; meaning that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive

9

scope of that agreement." *Watson Wyatt & Co. v. SBC Holdings, Inc.*, 513 F.3d 646, 649 (6th Cir. 2008) (alteration in original) (quoting *Bratt Enters., Inc. v. Noble Int'l Ltd.*, 338 F.3d 609, 612 (6th Cir. 2003)). "[D]oubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626, 105 S. Ct. 3346, 3353-54 (1986) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25, 103 S. Ct. 927, 941 (1983)). If the agreement to arbitrate is not "in issue," the Court must compel arbitration. 9 U.S.C. § 4. "In order to show that the validity of the agreement is 'in issue,' the party opposing arbitration must show a genuine issue of material fact as to the validity of the agreement to arbitrate." *Great Earth Cos. v. Simons*, 288 F.3d 878, 889 (6th Cir. 2002). "The required showing mirrors that required to withstand summary judgment in a civil suit." *Id.*

## IV. Discussion

### A. Existence of an Agreement to Arbitrate

Petitioners assert that Imhoff agreed to arbitration with Primerica when he executed FINRA Form U-4, the Uniform Application for Securities Industry Registration. Form U-4 states, in pertinent part:

> I agree to arbitrate any dispute, claim, or controversy that may arise between me and my firm . . . that is required to be arbitrated under the rules, constitutions, or bylaws of [FINRA] . . . and that any arbitration award rendered against me may be entered as a judgment in any court of competent jurisdiction.

Pet. Ex. C at 9 ¶ 5. Petitioners claim that Imhoff executed this form in order to become a

registered representative. Imhoff has not disputed this, and his Second Amended Verified Complaint admits that he had a Form U-4 on file with FINRA. *See* Resp't's Br. Ex. 1 ¶ 79. The Court therefore concludes that Imhoff has entered into an agreement to arbitrate disputes with Primerica.

**B. Scope of the Agreement to Arbitrate**

Of course, the finding of a valid agreement to arbitrate is not dispositive. The Court will only compel Imhoff to arbitrate his claims if those claims fall within the scope of the agreement's arbitration provision. *See Watson Wyatt*, 513 F.3d at 649. By executing Form U-4, Imhoff agreed to arbitrate any dispute between him and his firm that is required to be arbitrated under FINRA rules. The Court must therefore determine whether FINRA rules require arbitration of Imhoff's claims. As the parties' most recent filings with this Court treat the Second Amended Verified Complaint as the operative complaint, the Court will also do so.

**1. Insurance-Related Claims**

Imhoff contends that FINRA rules exempt his insurance-related claims from arbitration. FINRA Rule 13200(b) provides: "Disputes arising out of the insurance business activities of a member that is also an insurance company are not required to be arbitrated under the [FINRA Code of Arbitration Procedure for Industry Disputes]." The Rule does not define "insurance business activities," but federal courts have narrowly interpreted an identically-worded provision in the former National Association of

11

Securities Dealers Code,[1] holding that the exception did not include employment disputes, but only claims that are "intrinsically insurance" claims. *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 133 F.3d 225, 234 (3d Cir. 1998); *see also IDS Life Ins. Co. v. Royal Alliance Assocs.*, 266 F.3d 645, 652 (7th Cir. 2001) (noting that "[t]he purposes of the exclusion are to keep arbitrators away from issues that are peculiar to insurance, such as reserves, reinsurance, actuarial calculations, rates, coverage, and mandatory terms, and to prevent arbitrators from being swamped with insurance claims, which are apt to be more numerous than securities claims.").

The insurance exception to arbitration does not apply to Imhoff's claims. Imhoff asserts that Primerica's insurance practices are "at the heart" of his state-court litigation, pointing to Primerica's allegedly improper transfer of insurance accounts to other agents. Imhoff's claims, however, do not focus on Primerica's insurance practices. Rather, they dispute Primerica's general handling of certain accounts, some of which happened to belong to insurance customers. Imhoff's claims are not "peculiar to insurance" in any sense. The same is true concerning Imhoff's claims that Primerica damaged his reputation with an insurance vendor and wrongfully contacted insurance clients to appropriate their accounts. These claims only involve Primerica's insurance business tangentially, and cannot be said to arise from "insurance business practices" simply because the affected parties were insurance customers and an insurance vendor. Accordingly, the Court concludes that FINRA Rule 13002(b) does not exempt Imhoff's claims from arbitration.

---

[1] The National Association of Securities Dealers was a predecessor of FINRA.

**2. Injunctive Relief Claims**

Imhoff asserts that FINRA Rule 13804(a)(1) exempts his equitable relief claims from arbitration. FINRA Rule 13804(a)(1) provides: "In industry or clearing disputes required to be submitted to arbitration under the Code, parties may seek a temporary injunctive order from a court of competent jurisdiction." Petitioners argue Imhoff actually seeks permanent relief, and therefore, the Rule does not apply.

Imhoff misconstrues the purpose of the Rule. Subsection (b) of Rule 13804 clarifies the role of this provision:

> A party seeking a temporary injunctive order from a court with respect to an industry or clearing dispute required to be submitted to arbitration under the Code must, at the same time, file with the Director a statement of claim requesting permanent injunctive and all other relief with respect to the same dispute in the manner specified under the Code.

FINRA Rule 13804(b). Because the party seeking injunctive relief must also submit his claim to arbitration, it is clear that the request for temporary injunctive relief simply preserves the status quo until arbitration is commenced. Imhoff seeks the following equitable relief: (1) an accounting of commissions generated by the securities portion of his book of business; (2) an order prohibiting alteration or disclosure of personal information relating to the securities clients' accounts; (3) discovery to augment the requested accounting; (4) an order prohibiting the destruction of relevant records by the state court defendants; and (5) a declaration that the state court defendants acted wrongfully with regard to the securities clients' accounts. These are not measures of temporary relief. The requested order would not prevent the disputed changes to client accounts, as Imhoff alleges that Primerica made these changes in November 2008. The

accounting of commissions is merely an attempt to ascertain damages, and would provide no temporary relief. It need not be completed before arbitration commences, and the same can be said for discovery supporting this accounting. Finally, the requested declaratory relief is permanent by its very nature. The Court therefore concludes that the temporary injunctive relief provisions of FINRA Rule 13804(b) do not exempt Imhoff's claims from arbitration.

### C. Claims Against Non-FINRA Defendants

Imhoff argues that FINRA rules cannot compel him to arbitrate claims against Primerica Financial Services Home Mortgages, Inc., Primerica Financial Services, Inc., and Primerica Life Insurance Company, as those entities are not members of FINRA. Petitioners maintain that Imhoff cannot escape his obligation to arbitrate by naming these entities as defendants.

In some instances, a non-party to an arbitration agreement may compel a party that signed the agreement to arbitrate disputes. *See Federated Dep't Stores v. J.V.B. Industries Inc.*, 894 F.2d 862, 870-71 (6th Cir. 1990). In *Federated Department Stores*, TAB Industries, Inc. ("TAB") contracted with Federated Department Stores ("Federated") for some construction work. *Id.* at 864. J.V.B. Industries, Inc. ("JVB"), which shared a common owner with TAB, was not a party to this agreement. *Id.* at 870. The Sixth Circuit allowed JVB to compel Federated to arbitrate a dispute arising from the construction, noting that TAB and JVB had a close relationship and shared a common owner. *Id.* The Sixth Circuit has also held that if a party can avoid the consequences of an agreement to arbitrate by naming nonsignatory parties as defendants in his complaint, the

14

rule requiring arbitration would be effectively nullified. *Arnold v. Arnold Corp.*, 920 F.2d 1269, 1281 (6th Cir. 1990). It is beyond dispute that the non-FINRA members named as defendants in Imhoff's state-court action have a close relationship with the remaining Primerica entities. The firms are subject to common ownership and Imhoff alleges that they acted in concert to deprive him of commissions. As these non-FINRA members have sought arbitration, it is appropriate to compel arbitration of Imhoff's claims against them.

Petitioners further assert that arbitration should be compelled under the theory of equitable estoppel. Under this theory, courts have held that arbitration is appropriate where "the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more signatories of the contract." *Grigson v. Creative Artists Agency, LLC*, 210 F.3d 524, 527 (5th Cir. 2000). "Otherwise, the arbitration proceedings between the two signatories would be rendered meaningless and the federal policy in favor of arbitration effectively thwarted." *Id.* Courts in the Eastern District of Michigan have applied equitable estoppel in allowing non-signatories to compel arbitration. *See Simpson v. Lifenet, Inc.*, 09-cv-12228, 2010 U.S. Dist LEXIS 471, at *5 (E.D. Mich. Jan. 5, 2010). The Court concludes that equitable estoppel is appropriate here, as Imhoff's allegations involve concerted misconduct by the defendants. It would be inequitable to allow Imhoff to avoid arbitration of his claims simply by naming non-FINRA members as defendants.

## D. The "Basic Agreement"

Petitioners alternatively assert that the "Basic Agreement" between Imhoff and Primerica requires arbitration of his claims. Imhoff contends that he was empowered to

15

terminate this agreement at any time, with or without cause, and did so on August 8, 2009. Resp't's Reply Br. 3. Because the Basic Agreement's arbitration clause does not expressly state that it survives termination, Imhoff concludes that it does not apply to his claims.

Contractual provisions relating to remedies and dispute resolution, such as an arbitration provision, often survive the termination of the contract in order to enforce duties arising under the contract. *Litton Financial Printing Div. v. NLRB*, 501 U.S. 190, 208, 111 S. Ct. 2215, 2226 (1991) (citing *Nolde Bros., Inc. v. Bakery Workers*, 430 U.S. 243, 97 S. Ct. 1067 (1977)). "We presume as a matter of contract interpretation that the parties did not intend a pivotal dispute resolution provision to terminate for all purposes upon the expiration of the agreement." *Id.* This presumption may be negated "expressly or by clear implication." *Id.* at 204, 111 S. Ct. at 2224 (quoting *Nolde Bros.*, 430 U.S. at 255, 97 S. Ct. at 1074).

The Court accordingly presumes that the arbitration clause survives the Agreement's termination. As the Agreement is silent on this matter, *see* Resp't's Reply Br. Ex. C ¶ 15, it does not resolve the issue. Imhoff argues that the presumption of survival is negated by implication, pointing to "carve-out" provisions governing his conduct after any separation from Primerica. He identifies a clause concerning the use of confidential information, noting the clause's statement that it applies post-termination. By negative implication, Imhoff concludes that the arbitration clause must not apply post-termination. This argument lacks merit. Where an arbitration clause is broadly worded, "only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail." *United*

16

*Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 585, 80 S. Ct. 1347, 1354 (1960). Courts have therefore rejected this "negative implication" argument in similar cases. *See Dobson v. Counsellors Secs., Inc.*, 94-cv-73942, 1995 U.S. Dist LEXIS 17023, at *17 (E.D. Mich. Sept. 13, 1995) (holding that to avoid the federal rule that an arbitration clause survives the agreement containing it, the termination provision must be "plainly specific to the arbitration clause"). As the presumption that the arbitration clause survives termination of the Basic Agreement has not been negated, the Court concludes that the Agreement provides an alternative basis for compelling arbitration.

## V. Conclusion

For the reasons stated above, the Court concludes that it is appropriate to compel arbitration of Imhoff's state-court claims.

Accordingly,

**IT IS ORDERED** that Petitioners' Motion for Summary Judgment is **GRANTED**. Pursuant to 9 U.S.C. § 4, Respondent is directed to submit the claims asserted in his state-court action to arbitration before FINRA. Petitioners' request for an order staying the state-court proceedings is moot in light of the state court's order dated February 23, 2011, which stayed those proceedings pending this Court's ruling.

s/PATRICK J. DUGGAN<br>UNITED STATES DISTRICT JUDGE

Copies to:

Raymond W. Henney, Esq.
Edwin J. Vander Ploeg , Jr., Esq.
Demetrios A. Tountas, Esq.
Timothy A. Hoesch, Esq.